**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEZZI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 07-5121 |
| | : | |
| ARAMARK SPORTS, LLC, | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OPINION**

Goldberg, J.                                                                July 30, 2009

## I. Introduction

This case involves Title VII allegations raised by Plaintiff, Rocco S. Stezzi, III, who claims that he was wrongfully terminated by Defendant, Aramark Sports, LLC.  Specifically, Plaintiff raises claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA") asserting that his termination occurred as a result of his association with his girlfriend and co-worker, Carmela Risica, who was allegedly the victim of sexual harassment.  Plaintiff also claims that his termination was in retaliation for complaints he made about this harassment.

Currently before the Court is Defendant's Motion for Summary Judgment seeking the dismissal of both the associational discrimination and the retaliation claims.  As Plaintiff has failed to demonstrate a genuine issue of material fact regarding associational discrimination, Defendant's motion on this claim will be granted.  However, because the Court finds that there are material facts in dispute regarding Plaintiff's retaliation allegation, Defendant's motion on that claim will be denied.

1

## II. **Pertinent Facts**

_____Defendant manages the food and beverage services at Citizen's Bank Park, home of the Philadelphia Phillies.  Plaintiff first worked for Defendant in 2002 and continued to do so through the first half of the 2003 baseball season, serving food at Veteran's Stadium, the prior venue used by the Phillies.  Plaintiff returned to work for Defendant at the start of the 2004 baseball season, working at the Phillies' new stadium, Citizen's Bank Park, where he remained through the 2005 baseball season.  During the 2005 off-season, Plaintiff also worked at a number of banquets as a server and captain and was then invited to return for the 2006 season.  Plaintiff's employment was terminated on March 31, 2006.  (Def.'s Mot. for Summ. J., Ex. K.)[1]  The events leading up to his termination are as follows.

Sometime in 2005, Plaintiff and a co-worker, Carmen Risica, entered into a romantic relationship.  On July 9, 2005, Plaintiff filed a formal complaint of sexual harassment with Defendant, on behalf of Risica.  Specifically, Plaintiff alleged that Rich Green, the manager of the group that Plaintiff and Risica worked in, had asked Risica about her relationship status, followed her out of the stadium, and wrote letters to her of an inappropriate nature.  Plaintiff's letter was addressed to Sabrina Knouse, Regional Human Resources Manager, and faxed to Ms. Knouse on July 11, 2005.  (Def.'s Mot. for Summ. J., Ex. C; Pl. Dep., pp. 31, 34-35, 36-37, 56.)

Ms. Knouse responded to Plaintiff on the same day she received his fax and shortly thereafter, met with Green and Risica.  Ms. Knouse subsequently advised Plaintiff that everything

---

[1]The termination correspondence signed by Defendant's District Manager stated, "By means of this letter, I want to inform you that your employment with ARAMARK has been severed as of March 31, 2006.  The reason for our decision is based upon the disruptive conduct that you have exhibited that has created an intimidating and offensive work environment, which we feel, has interfered with our work functions."

had been taken care of but did not disclose the content of her conversations with Green and Risica to Plaintiff, citing Defendant's confidentiality policy. (Pl. Dep., pp. 58-59, 99-100.)

Thereafter, Plaintiff and Risica jointly wrote a letter to Defendant's District Manager, Brian Hastings, dated August 14, 2005, again alleging that Green had been sexually harassing Risica. This letter also raised a new complaint that Green had now threatened Plaintiff. Plaintiff and Risica attended a meeting on August 16, 2005 with several members of Defendant's management, as well as Plaintiff's union representative. At that meeting, Plaintiff provided the August 14, 2005 letter signed by him and Risica, as well as e-mails exchanged between Green and Risica. (See, generally, Pl. Dep., pp. 60-64, 88-95, 107-09, 113, 120, 128, 131-32.) Plaintiff summarized the meeting during his deposition as follows: "We went over the paperwork. They were reading it. They said this is very serious. We'll take this seriously. We're going to look into this. We have to look into this before we can make any judgments." Defendant's representatives at the meeting assured Plaintiff that Mr. Green would stay away from him and Mr. Green was similarly advised and directed to give Plaintiff work instructions through intermediary supervisors. (Pl. Dep, pp. 209-10, 220, 238.) Approximately one week later, Plaintiff supplied Defendant's management personnel with what he deemed to be further supporting documentation. Plaintiff was again advised that management had dealt with the situation and it had been "taken care of." (Pl. Dep., pp. 219-30, 248-55; Def.'s Mot. for Summ. J., Exs. F, G, H.)

Thereafter, Plaintiff followed-up by telephone with H. R. Manager, Knouse, who advised that she would be leaving her position and directed Plaintiff to speak to Jim Gwinn, Defendant's Associate Vice President of Human Resources. Plaintiff and Risica both contacted Gwinn and provided him with what they viewed as further supporting documentation. (Pl. Dep., pp. 60, 65-67,

219, 221-22, 219-35; Def.'s Mot. for Summ. J., Exs. F, G, H.)  On September 23, 2005, Gwinn met with Plaintiff and Risica, and on October 19, 2005, Gwinn informed Plaintiff that everything had been taken care of.  Additionally, at some point Green was given an undated written reprimand for "harassment" in which he was notified that a subsequent incident could be cause for immediate dismissal.  (Pl. Dep., pp. 248-58; Def.'s Mot. for Summ. J., Ex. C.)

Plaintiff continued to work for Defendant for the remainder of the Phillies' 2005 season and selected off-season banquets without incident.  Indeed, from August 16, 2005, through the remainder of 2005 and well into 2006, Green stayed away from Plaintiff and, as directed, never spoke to him. While Plaintiff alleges that Green "stared" at him from a distance, and caused him to feel uncomfortable, no further complaints were raised by Plaintiff or Risica.  (Pl. Dep., pp. 210-17.)

After Defendant invited Plaintiff back for the Phillies' 2006 season, Plaintiff worked at a special event at the Citizen's Bank Park on March 8, 2006.  This event took place approximately nine months after Plaintiff's discrimination complaint was filed.  After the event, Green told Plaintiff he did a good job while passing him in a corridor.  Plaintiff acknowledged that he took this remark at face value and that Green was praising his work.  Despite the innocuous nature of this comment, Plaintiff complained to management.

Defendant alleges that on the same day that Green's "good job" comment was made, Plaintiff engaged in three separate conversations with supervisors regarding the incident.  According to Defendant, when Plaintiff was offered a transfer to a different department, Plaintiff declined the offer because he considered it a demotion.  (Pl. Dep., pp. 261-73.)  Defendant has described Plaintiff's conversation with his supervisors as 'heated and threatening."  Defendant also claims that other employees observed that Defendant "became infuriated" . . ., and "went off in a tirade," and that

4

ARAMARK personnel felt threatened.  Plaintiff was further described as being  "full of disgust, but he was also gloating in the fact that he could do anything around here and get away with it."  (Def.'s Mot. for Summ. J., pp. 11-14.)  Plaintiff denies this behavior.  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., pp. 13-14.)  As set forth above, by letter dated March 31, 2006, Plaintiff's employment was terminated for creating an "intimidating and offensive work environment."

        Plaintiff filed his Complaint on December 5, 2007, alleging sex discrimination and retaliation pursuant to 42 U.S.C. 2000E (Counts I and II) and violations under the Pennsylvania Human Relations Act (Counts III and IV).  Defendant filed its Answer and Affirmative Defenses on February 4, 2008, and moved for summary judgment on July 16, 2008.

## III. <u>Legal Standard - Summary Judgment</u>

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must be both 1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322-23.  A Plaintiff cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather,

must present evidence from which a jury could reasonably find in his favor.  Ridgewood Bd. Of Edu. v. NE for M.E., 172 F.3d 238, 252 (3d Cir. 1999).  Finally, in reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

**IV. The Title VII Sex Discrimination Claim**[2]

Title VII's anti-discrimination provision makes it unlawful for an employer:

> "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Thus, in order to establish a prima facie case of discrimination, Plaintiff must show: (1) that he is a member of a protected class; (2) that he suffered some form of adverse employment action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently.  Lamb-Bowman v. Delaware State University, 152 F.Supp.2d 553, 558-59 (D. Del. 2001), aff'd, 39 F. App'x 748 (3d Cir. 2002).

---

[2]In Counts III and IV, Plaintiff has alleged claims pursuant to the Pennsylvania Human Relations Act.  These claims are generally subject to the same standards and analysis as Title VII claims. Gomez v. Allegheny Health Serv. Inc., 71 F.3d 1079 (3d Cir. 1995).  A claim for associational discrimination under the PHRA may also be treated similarly by the state courts as Title VII jurisprudence.  Zielonka v. Temple University, 2001 U.S. Dist. Lexis 16732 (E.D. Pa. 2001).

Federal Courts apply the <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), burden-shifting analysis to Title VII claims of discrimination and retaliation.  Plaintiff first must make a prima facie showing, creating a presumption of discrimination.  <u>Id.</u> at 802.  The burden then shifts to the Defendant to demonstrate a legitimate, nondiscriminatory reason for its actions.  <u>Id.</u>  If Defendant succeeds, the burden shifts back to Plaintiff to "cast sufficient doubt" on Defendant's proffered nondiscriminatory reason such that a reasonable fact-finder could conclude that the reason was fabricated.  <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

Because Plaintiff, a white male, is not a member of a protected class, he attempts to establish a prima facie case of discrimination through his association with Ms. Risica and alleges that:

> "Mr. Green's harassment of Mr. Stezzi was motivated by Mr. Stezzi's gender, male, since he was dating Ms. Risica on whose behalf Mr. Stezzi filed a sexual harassment complaint against Mr. Green."
>
> . . .
>
> "In other words, Mr. Green would not have harassed Mr. Stezzi but for his being male and dating Ms. Risica."

(Compl., ¶ 35; Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., pp. 19-20.)[3]

---

[3]As noted above, Plaintiff has raised two counts pursuant to Title VII: one for sex discrimination and one for retaliation.  However, in paragraph thirty-four (34) of the complaint, Plaintiff also states that Green's actions created "a hostile work environment."  Sexual harassment that was so pervasive as to create a hostile work environment is proscribed under Title VII, but this cause of action requires elements of proof additional to those that establish a Title VII sex discrimination claim.  <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1482 (3d Cir. 1990).  While Plaintiff has not pled an actual hostile work environment claim, the Court's holding on Plaintiff's sex discrimination claim as set forth <u>infra</u>, would resolve any accompanying hostile work environment claim in favor of Defendant.  This is so because the Third Circuit's factors to establish a claim for a sexually hostile work environment incorporate proof of sex discrimination. <u>Id.</u> (establishing as the first prong of the Third Circuit's test for sexually hostile work environment, "(1) the employees suffered intentional discrimination because of their sex").

At the outset, we recognize that Title VII claims are to be given a liberal construction. Culpepper v. Reynolds Metal Co., 421 F.2d 888, 891 (5th Cir. 1970) ("it is...the duty of the courts to make sure that the Act works, and the intent of Congress is not hampered by a combination of a strict construction of the statute in a battle with semantics").

While Federal Courts have recognized Title VII claims for associational discrimination, such claims are typically predicated upon discrimination against a plaintiff because of race. Zielonka v. Temple University, 2001 WL 1231746 *5 (E.D. Pa. 2001) (plaintiff allegedly denied tenure because of his association with African American); Holcomb v. Iona College, 521 F.3d 131, 138-39 (2d Cir. 2008) (termination of male Caucasian employee who was married to an African-American woman constituted discrimination based on the husband's own race); Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 884 (7th Cir. 1998) (key inquiry in associational race discrimination claim "should be whether the employee has been discriminated against and whether that discrimination was because of the employee's race"); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 892 (11th Cir. 1986) (where associational claim of discrimination based upon an interracial marriage, by definition, allegation is that discrimination because of plaintiff's race).

Here, Plaintiff, a white male, asks this Court to extend the reach of an associational discrimination Title VII claim to include a gender-based claim. Plaintiff explains that this theory is viable because: "Mr. Green's harassment of Mr. Stezzi was motivated by Mr. Stezzi's gender, male, since he was dating Ms. Risica, on whose behalf Mr. Stezzi filed a sexual harassment complaint against Mr. Green. In other words, Mr. Green would not have harassed Mr. Stezzi but for his being male and dating Ms. Risica." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., pp. 19-20.) Plaintiff, however, has not pointed to any evidence reflecting that he was discharged because he was

a male.  Moreover, there is currently no precedential support to extend a Title VII claim in this manner.

The Third Circuit has not granted relief in an associational sex discrimination case.  While the issue of associational discrimination based on gender was considered in Lamb-Bowman v. Delaware State University, supra, that case dealt with the plaintiff's association with women's athletics.  Both the District Court and the Third Circuit found that plaintiff's claim that she was fired due to her complaints about disparate funding for men's and women's athletics, had no bearing on her sex.  In short, both Courts ruled that plaintiff's allegations were based on her opposition to defendant's funding allocation decisions.  Bowman, 39 Fed. App'x. at 750.

The only case cited by either party which considers the possibility of a gender-based associational discrimination claim is Partners Healthcare System v. Sullivan, 497 F.Supp.2d 29 (D. Mass. 2007).  There, a male employee of defendant, who had a heterosexual domestic partner, alleged associational discrimination based on his employer's offer of employee benefits to unmarried same-sex domestic partners and not unmarried heterosexual domestic partners.  While noting that a Title VII claim involving sexual orientation should not automatically be rejected, the Massachusetts District Court dismissed the claim stating that:

> "Defendant Webster is a heterosexual male who lives with a female domestic partner. There is absolutely no reason to believe that he was discriminated against on the basis of any stereotypical sex characteristic demonstrated in the workplace.  To the extent that MCAD Defendants advance a stereotyping claim in this case, it fails."

Id. at 39.  Thus, while the Massachusetts District Court did leave open the possibility that an associational sex discrimination claim may be cognizable under the right facts, those facts were not present.

Here, there are also insufficient facts to persuade this Court to extend an associational discrimination claim to the gender context. The facts relied upon by Plaintiff have nothing to do with his gender, but rather, revolve around his relationship with Risica, and, in turn, her relationship with Green. Plaintiff has failed to establish a connection between these claims and his own gender. Being in a relationship with a person of a different gender who may have been subjected to harassment is not sufficient. Read as a whole, Plaintiff's complaints center around the problems sometimes encountered in a workplace where one employee has a relationship with two co-workers. Whatever the dynamics of these two separate relationships were, they did not, as required, involve discrimination against Plaintiff due to his gender. Because the Court finds that Plaintiff was not discriminated against because of his gender, he fails as a matter of law to establish a claim for sex discrimination under Title VII..

### V. <u>Plaintiff's Retaliation Claim</u>

As set forth above, Plaintiff has also raised a retaliation claim. Title VII's anti-retaliation provision makes it unlawful for an employer:

> to discriminate against any of his employees or applicants for employment...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Plaintiff alleges that Defendant retaliated against him after he complained about the alleged sexual harassment of a co-worker by a supervisor.

For a prima facie case of retaliation under Title VII, Plaintiff must show: (1) that he engaged in a protected activity; (2) that Defendant took adverse employment action against him; and (3) that a causal link exists between the protected activity and the adverse action. <u>Id.</u> at 559 (citing <u>Kachman</u>

v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999)).

As to the first element, a protected activity is any opposition to an employment practice deemed to be discriminatory under Title VII. 42 U.S.C. §2000e-3(a). An informal letter stating a specific complaint about discriminatory behavior can be sufficient. See Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995); Bianchi v. City of Phila., 183 F.Supp.2d 726, 739 (E.D. Pa. 2002). An employee does not need to demonstrate that the action he protests is actually a violation of Title VII, instead he need only to have a good faith belief that his behavior is protected conduct. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

Viewing the evidence of record in the light most favorable to Plaintiff, we find that Plaintiff did have the requisite good faith belief he was protesting protected conduct in that on several occasions he notified Defendant's management personnel of the alleged sexual harassment of Risica. This good faith belief could be established through Plaintiff's awareness of Green's questioning Risica about her relationship status, following her out of work, and writing letters of an inappropriate nature. Indeed, Risica herself wrote a letter to management describing unwanted sexual advances by Green. (Def.'s Mot. for Summ. J., Ex. F.) Thus, Plaintiff has established the first prong of a prima facie case for retaliation.

Regarding the second element of retaliation , an adverse employment action is any action that would dissuade a reasonable employee from making or supporting a discrimination claim. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). The Court looks at the particular circumstances of the case, recognizing that an act that is immaterial in some situations might be material in others. Id. at 69 (citing Washington v. Illinois Dept. Of Revenue, 420 F.3d 658, 662 (C.A. 7 2005)). At the same time, we recognize that "an employee's decision to report

11

discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. at 68.

Plaintiff identifies three potential adverse actions to establish the second element of his retaliation case.  First, he identifies an adverse employment action when Green, his supervisor, threatened and harassed him following his complaints of Green's sexual harassment of Risica. Second, he alleges that ARAMARK did not continue to protect him from all contact from Green. Third, Plaintiff cites to his termination.  Although it is undisputed that Defendant promptly responded to Plaintiff's complaints, when viewed together and in the light most favorable to Plaintiff, we find that evidence of Green's alleged threats toward him, the alleged deficiencies of keeping Plaintiff and Green apart and his termination are sufficient evidence of adverse employment actions to survive summary judgment.

Lastly, Plaintiff must establish that a causal link exists between the protected activity and the adverse action.  "Analyzing the relationship between the pursuit of the harassment claim and adverse employment action in a retaliatory discharge claim involves three steps: (1) the plaintiff must provide enough evidence to raise the inference that the defendant retaliated against him; (2) the defendant can show a legitimate non-discriminatory reason for their actions; and (3) the plaintiff can show the defendant's reason is a mere pretext for their firing." Bianchi v. City of Phila., 183 F.Supp.2d 726, 740 (E.D. Pa. 2002) (citing Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986). Plaintiff has proffered enough evidence to raise an inference of retaliation.  As set forth above, the facts viewed in Plaintiff's favor, especially his termination, do create factual issues of retaliation.

Defendant has demonstrated as its legitimate non-discriminatory reason for firing Plaintiff that Plaintiff acted in an unreasonable and threatening manner to supervisors on March 8, 2006.

12

Plaintiff counters that Defendant's non-discriminatory reason for firing Plaintiff was pretext in that Defendant has mischaracterized Plaintiff's behavior on March 8, 2006.  He states that he was not threatening to supervisors in any manner.  Plaintiff also argues that Defendant departed from its own policy for termination of employees when he was fired.  (See Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., pp. 14-16, 40-41.)  Defendant responds that its decision to terminate Plaintiff's employment was a legitimate business decision that, as a matter of law, cannot be second-guessed by a dissatisfied employee.  See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992).  Viewing all facts and inferences in a light most favorable to Plaintiff, the Court finds that Plaintiff has pointed to enough facts to create an inference that his termination was the result of his complaining about Green's sexual harassment of Risica.  Indeed, Plaintiff's own assertion that he was not threatening in any way and that his behavior after the March 8, 2006 incident was proper, creates a factual issue that is more appropriate for resolution by a fact finder.  Thus, the Court denies Defendant's motion for summary judgment as to retaliation.

An appropriate order follows.